## STERLING, GOVERNOR OF TEXAS, ET AL. *v.* CONSTANTIN ET AL.

Nos. 11 and 453. Argued November 15, 16, 1932.—Decided December 12, 1932.

*Messrs. E. F. Smith* and *Dan Moody*, with whom *Mr. Paul D. Page, Jr.*, was on the brief, for appellants.

382

*Messrs. Joseph W. Bailey, Jr.,* and *Luther Nickels* for appellees.

386

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The District Court, composed of three judges (U. S. C., Tit. 28, § 380), granted an interlocutory injunction restraining the appellants, Ross S. Sterling, Governor of the State of Texas, W. W. Sterling, Adjutant General of the State, and Jacob F. Wolters, Brigadier General of the Texas National Guard, from enforcing their military or executive orders regulating or restricting the production of oil from complainants' wells and from interfering in any manner " with the lawful production of oil from complainants' property." 57 F. (2d) 227. By stipulation, causes of action set forth in the amended bill of complaint against these defendants and others were severed and the suit proceeded to trial upon the merits against these defendants separately and was submitted upon the pleadings and the evidence taken on the application for the interlocutory injunction. The court entered final judgment making the interlocutory injunction permanent, and appeals have been taken to this Court from both the interlocutory order and the final judgment. As the case is now here on the latter appeal (No. 453), the appeal from the interlocutory order (No. 11) will be dismissed. *Champlin Refining Co.* v. *Corporation Commission,* 286 U. S. 210, 224.

Complainants, as owners of interests in oil and gas leaseholds, originally brought the suit, on October 13, 1931, against members of the Railroad Commission of Texas, the Attorney General of the State, Brigadier General Wolters, and others, to restrain the enforcement of orders of the Commission limiting the production of oil. These orders were alleged to be arbitrary and illegal, as having been made in violation of the statutes of Texas and in pursuance of a conspiracy in the interest of prices, and as operating to deprive complainants of their property without due process of law contrary to both the State and the Federal constitutions. The District Judge set the application for preliminary injunction for hearing on October 28, 1931, before a specially constituted court of three judges, and meanwhile made a temporary order restraining the defendants from limiting complainants' production below 5,000 barrels per well. 57 F. (2d) p. 229. The defendants who were members of the Railroad Commission accordingly ceased their attempt to enforce the orders thus challenged.

Previously, on August 16, 1931, Governor Sterling had issued a proclamation stating that certain counties (in which complainants' properties were located) were in " a state of insurrection, tumult, riot, and a breach of the peace," and declaring " martial law " in that territory. The Governor directed Brigadier General Wolters to assume supreme command of the situation and to take such steps as he might deem necesary in order " to enforce and uphold the majesty of the law," subject to the orders of the Governor as Commander in Chief, as given through the Adjutant General. From that time, General Wolters acted as " commanding officer of said military district."

When the District Court made its temporary restraining order in this suit, as above stated, Governor Sterling, learning that the orders made by the Railroad Commis-

sion could no longer be enforced, issued his oral and written orders to General Wolters to limit the production of oil in the described military district to 165 barrels per well per day. This was the limit fixed by the Commission's order of October 10th the enforcement of which was subject to the restraining order. On October 28th, the Governor made the limit 150 barrels and on November 6th, 125 barrels. These orders were enforced by General Wolters, and contempt proceedings were brought against him.

On November 20, 1931, by leave of the District Court, complainants filed an amended bill making Governor Sterling and W. W. Sterling, Adjutant General, parties to the suit and alleging that the above mentioned military and executive orders limiting production were without justification in law or in fact, were arbitrary and capricious, and were repugnant to the State and Federal constitutions. Complainants alleged that there had been no request by the civil authorities for the use of the military forces; that all courts in said area were " open and transacting their ordinary business "; that there were " no armed bodies of civilians in said area " nor " any bodies of men threatening bloodshed, violence or destruction "; but that, on the contrary, " the citizens in said community are in a quiet, peaceable condition ·and amenable and obedient to any process which might be served upon them." Defendants, Governor Sterling, Adjutant General Sterling, and General Wolters, answered the bill setting forth the executive proclamation and orders, and the declaration of martial law, and asserting the validity of the acts assailed. By a supplemental petition, in response to the answer, complainants denied that the Governor, under the constitution and statutes of the State, could lawfully exercise the authority he had assumed, and specifically alleged that if any statute of the State conferred such authority it contravened stated pro-

visions of the Constitution of the State and the due process and equal protection clauses of the Fourteenth Amendment. At the time of the hearing of the application for preliminary injunction, it appeared that the executive orders had further limited the complainants' production to 100 barrels per day. 57 F. (2d) p. 229.

Upon that application, the District Court received the evidence submitted by both parties, and considering it to be "without substantial conflict," stated that it established the following facts:

In August, 1931, the Legislature of Texas passed an amended oil and conservation act. Chap. 26, Vernon's Ann. Civ. St. Texas, Arts., 6008, 6014, 6029, 6032, 6036, 6049c. The Governor in issuing his proclamation of August 16th recited the provisions of the constitution and statutes of Texas for the conservation of oil and gas and the existence in the East Texas oil field, the territory in question, of an organized group of oil and gas producers who were said to be in a state of insurrection against the conservation laws; that the civil officers did not have a sufficient force to compel them to obey; that by reason of their reckless production enormous physical waste was being created; that this condition had brought about such a state of public feeling that if the state government could not protect the public's interest they would take the law into their own hands; that this condition had caused threats of acts of violence; that it was necessary to give the Railroad Commission time to have hearings and promulgate proper orders to put the law into force; that a state of "insurrection, tumult, riot and breach of the peace existed in the defined area" and that there was "serious danger threatening to citizens and property, not only there, but in other oil producing areas of the State"; and that it was necessary "that the reckless and illegal exploitation" should be stopped until such time as the said resources might be properly conserved and developed

under the protection of the civil authorities. The troops were then called out and the oil wells were shut down. In September, after the Commission had made its order limiting production, while the proclamation of martial law was not rescinded nor the troops entirely withdrawn, the military occupation in force ended. The wells were opened and continued to produce daily under the order of the Railroad Commission. General Wolters, with the assistance of the "Rangers," the civil officers of the community, and "the few military still remaining in the field," and in aid of the Commission, patrolled the territory to see that its orders were complied with; that from time to time the Commission, sometimes with the approval, and sometimes with the disapproval, of the Governor made its orders further limiting production, and these orders were obeyed.

The District Court also found that after the restraining order against the Commission had been issued in this suit, the defendants, Governor Sterling and General Wolters, "determined not to brook court interference with the program of restricted production which they determined to continue." Acting "in the real, though mistaken, belief that the federal court, while competent as to the Commission, was during the continuance of the proclaimed state of war without jurisdiction over their action," by virtue of the claim, which the District Court found to be wholly without support in the evidence, "that war conditions were prevailing in the field, and that military necessity required the action," they "ousted the Commission from the fixing of and superintendence over the daily production allowed, and have since controlled production by purported military orders."

As to the actual conditions in the area affected by these orders the District Court made the following finding:

"It was conceded that at no time has there been any actual uprising in the territory. At no time has any mili-

tary force been exerted to put riots or mobs down. At no time, except in the refusal of defendant Wolters to observe the injunction in this case, have the civil authorities or courts been interfered with or their processes made impotent. Though it was testified to by defendants that from reports which came to them they believed that, if plaintiffs' wells were not shut in, there would be dynamiting of property in the oil fields, and efforts to close them and any others which opened by violence, and that, if that occurred, there would be general trouble in the field, no evidence of any dynamite having been used, or show of violence practiced or actually attempted, or even threatened against any specific property in the field, was offered. We find, therefore, that not only was there never any actual riot, tumult, or insurrection, which would create a state of war existing in the field, but that, if all of the conditions had come to pass, they would have resulted merely in breaches of the peace to be suppressed by the militia as a civil force, and not at all in a condition constituting, or even remotely resembling, a state of war." 57 F. (2d) p. 231.

Referring to the testimony of Governor Sterling and General Wolters that the orders had not been issued for the purpose of affecting prices, nor even *per se* to limit production, but " as acts of military necessity to suppress actually threatened war " as they believed from reports brought to them that " unless they kept the production of oil down to within 400,000 barrels, a warlike riot and insurrection, in fact a state of war, would ensue," the District Court said:

" We find no warrant in the evidence for such belief. Looking at it in the light most favorable to defendants' contention, it presents nothing more than threats of violence or breaches of the peace. The testimony showed that martial law had not ousted the commission from making and enforcing rules regulating conservation, ex-

cept alone as to production from the field. One of their witnesses testified: ' Now the Governor with his military representatives has taken over the proration end but the conservation end is still with the Commission.' The evidence shows no insurrection nor riot, in fact, existing at any time in the territory, no closure of the courts, no failure of civil authorities. It shows that at no time has there been in fact any condition resembling a state of war, and that, unless the Governor may by proclamation create an irrebuttable presumption that a state of war exists, the actions of the Governor and his staff may not be justified on the ground of military necessity." *Id.*

Having thus found the facts, the District Court, maintaining its jurisdiction, examined the provisions of the constitution and statutes of the State to ascertain whether they had conferred upon the Governor the power he had assumed to exercise. The court concluded that not only was no such affirmative authority conferred but that express provisions of the constitution withheld such power; that when the Governor calls out the troops of Texas, it is not as a military but as a civil officer; that their powers and duties are derived from the civil law; and that at no time and under no conditions are their actions above court review. The court held that, under the constitution of Texas, courts may not be closed or their processes interfered with by military orders, that courts cannot be ousted by the agencies detailed to aid them, and that their functions cannot be transferred to tribunals unknown to the constitution. In this view, the court decided that appellants "without warrant of law " had been depriving complainants of their undoubted right to operate their own properties in a prudent and reasonable way, in accordance with the laws of the State. 57 F. (2d) pp. 236–241. The final judgment, entered pursuant to the stipulation of the parties and upon the same record, rests upon the same findings and conclusions.

Appellants contend (1) that the Governor has power to declare martial law; (2) that courts may not review the sufficiency of facts upon which martial law is declared; (3) that courts may not control by injunction the means of enforcing martial law; and (4) that the finding of the Governor of necessity to take property is due process of law.

*First.* The District Court had jurisdiction. The suit is not against the State. The applicable principle is that where state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief. *Ex parte Young,* 209 U. S. 123, 155, 156; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 U. S. 278, 292, 293; *Truax* v. *Raich,* 239 U. S. 33, 37, 38; *Cavanaugh* v. *Looney,* 248 U. S. 453, 456; *Terrace* v. *Thompson,* 263 U. S. 197, 214. The Governor of the State, in this respect, is in no different position from that of other state officials. See *Davis* v. *Gray,* 16 Wall. 203, 210, 233; *Continental Baking Co.* v. *Woodring,* 286 U. S. 352; *Binford* v. *McLeaish,* 284 U. S. 598; 52 F. (2d) 151, 152; *Sproles* v. *Binford,* 286 U. S. 374. Nor does the fact that it may appear that the state officer in such a case, while acting under color of state law, has exceeded the authority conferred by the State, deprive the court of jurisdiction. *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239, 246; *Fidelity & Deposit Co.* v. *Tafoya,* 270 U. S. 426, 434.

As the validity of provisions of the state constitution and statutes, if they could be deemed to authorize the action of the Governor, was challenged, the application for injunction was properly heard by three judges. *Stratton* v. *St. Louis Southwestern Ry. Co.,* 282 U. S. 10. The jurisdiction of the District Court so constituted, and of this Court upon appeal, extends to every question involved, whether of state or federal law, and enables the

court to rest its judgment on the decision of such of the questions as in its opinion effectively dispose of the case. *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175, 191; *Louisville & Nashville R. Co.* v. *Garrett,* 231 U. S. 298, 303; *Davis* v. *Wallace,* 257 U. S. 478, 482; *Waggoner Estate* v. *Wichita County,* 273 U. S. 113, 116.

*Second.* Appellants rely upon Article IV, §§ 1, 7 and 10 of the state constitution, and Articles 5778, 5830, 5834 and 5889 of the Revised Civil Statutes of the State, 1925. The provisions of the state constitution make the Governor the Chief Executive Officer of the State and Commander in Chief of its military forces, with " power to call forth the militia to execute the laws of the State, to suppress insurrections, repel invasions, and protect the frontier." The Governor " shall cause the laws to be faithfully executed." The statutes cited are set forth in the margin.[1]

---

[1] " Revised Civil Statutes of Texas, 1925:

"Art. 5778. The Governor shall have power in the case of insurrection, invasion, tumult, riot or breach of peace, or imminent danger thereof, to order into the active service of this State any part of the militia that he may deem proper.

"Art. 5830. When an invasion of, or an insurrection in, this State is made or threatened, or when the Governor may deem it necessary for the enforcement of the laws of this State, he shall call forth the active militia or any part thereof to repel, suppress, or enforce the same, and if the number available is insufficient he shall order out such part of the reserve militia as he may deem necessary.

"Art. 5834. The Governor may order the active militia, or any part thereof, to assist the civil authorities in guarding the prisoners, or in conveying prisoners from and to any point in this State, or discharging other duties in connection with the execution of the law as the public interest or safety at any time may require.

"Art. 5889. Whenever any portion of the military forces of this State is employed in aid of the civil authority, the Governor, if in his judgment the maintenance of law and order will thereby be promoted, may, by proclamation, declare the county or city in which the troops are serving, or any special portion thereof, to be in a state of insurrection."

In support of the conclusion of the court below that the Governor did not have authority as extensive as that asserted in this case, appellees invoke the provisions of the Bill of Rights (Article I) of the state constitution as follows:

" Sec. 12. The writ of *habeas corpus* is a writ of right, and shall never be suspended . . . .

" Sec. 24. The military shall at all times be subordinate to the civil authority.

" Sec. 28. No power of suspending laws in this State shall be exercised except by the Legislature.

" Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this ' Bill of Rights ' is excepted out of the general powers of the government and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."

Appellees contend that the subsequent Articles of the Constitution are to be construed in harmony with these provisions of the Bill of Rights, and that these show clearly that it was not the intention of the people of Texas to confer upon the Governor the authority to declare martial law, but only to suppress insurrections, to repel invasions and to afford the protection necessary to preserve the peace, acting in aid, and not in subversion, of the civil authority and of the jurisdiction of the courts. These provisions, said the District Court, " were written into the fundamental law as direct inhibitions upon the executive, by men who had suffered under the imposition of martial law, with its suspension of civil authority, and the ousting of the courts during reconstruction in Texas."
" In every convention," said the court, " in every gathering assembled, protesting the suppression of free speech, the interference with the processes, the judgments, the decrees of courts, these men had denounced martial tyranny, and sought relief against it, and, when they met

to adopt the constitution of 1876 which still obtains, they determined to, and they did, so write the fundamental law that such deprivations of liberty might never again occur." 57 F. (2d) p. 237.

While we recognize the force of these observations, and the question of the interpretation of the provisions of the state constitution is before us, it is still a matter of local law, as to which the courts of the State would in any event have the final word. We do not find it necessary to determine that question and we shall not attempt to explore the history of Texas or to review the decisions of the state courts cited by the appellees.[2] We pass to the consideration of the federal question presented, and for that purpose we shall assume, without deciding, that the law of the State authorizes what the Governor has done.

*Third.* The existence and nature of the complainants' rights are not open to question. Their ownership of the oil properties is undisputed. Their right to the enjoyment and use of these properties subject to reasonable regulation by the State in the exercise of its power to prevent unnecessary loss, destruction and waste, is protected by the due process clause of the Fourteenth Amendment. *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Walls* v. *Midland*

---

[2] *Ex parte Coupland,* 26 Tex. 386; *Ex parte Turman,* 26 Tex. 708; *Ex parte Mayer,* 27 Tex. 715; *State* v. *Sparks,* 27 Tex. 627; *id.,* 705; *The Emancipation Cases,* 31 Tex. 504; *Arroyo* v. *State,* 69 S. W. 503. See, also, *Franks* v. *Smith,* 142 Ky. 232; 134 S. W. 484; *Fluke* v. *Canton,* 31 Okla. 718; 123 Pac. 1049; *Bishop* v. *Vandercook,* 228 Mich. 299; 200 N. W. 278; *In re McDonald,* 49 Mont. 454; 143 Pac. 947; *Herlihy* v. *Donohue,* 52 Mont. 601; 161 Pac. 164; *Allen* v. *Gardner,* 182 N. C. 425; 109 S. E. 260. Compare *State ex rel. Mays* v. *Brown,* 71 W. Va. 519; 77 S. E. 243; *In re Jones,* 71 W. Va. 567; 77 S. E. 1029; *Hatfield* v. *Graham,* 73 W. Va. 759; 81 S. E. 533; *Ex parte Lavinder,* 88 W. Va. 713; 108 S. E. 428; *In re Moyer,* 35 Colo. 159; 85 Pac. 190; *In re Boyle,* 6 Idaho 609; 57 Pac. 706; *Commonwealth ex rel. Wadsworth* v. *Shortall,* 206 Pa. St. 165; 55 Atl. 952.

*Carbon Co.*, 254 U. S. 300; *Bandini Petroleum Co.* v. *Superior Court*, 284 U. S. 8; *Champlin Refining Co.* v. *Corporation Commission*, 286 U. S. 210. The State, in this instance, had asserted its regulatory authority by enacting laws for the prevention of waste and had empowered the Railroad Commission to investigate and to establish rules to this end. The Commission then made its orders governing and limiting oil production. The complainants brought suit in the federal court to restrain the enforcement of these orders upon the ground that they were unauthorized, arbitrary and capricious, and violated the federal right to the enjoyment and use of the properties. Exercising the jurisdiction conferred by federal statute, a federal judge had granted a temporary restraining order, pending the convening of the court which by that statute was charged with the duty to determine whether the requirement of the Commission was valid or its enforcement should be enjoined. While this orderly process was going forward, it was superseded and in effect nullified by the Governor of the State, who undertook by military order to effect the limitation which the Commission by that process was for the time being forbidden to maintain. And when the federal court, finding his action to have been unjustified by any existing exigency, has given the relief appropriate in the absence of other adequate remedy, appellants assert that the court was powerless thus to intervene and that the Governor's order had the quality of a supreme and unchallengeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the Federal Government.

If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would

be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression. To such a case the federal judicial power extends (Art. III, § 2) and, so extending, the court has all the authority appropriate to its exercise. Accordingly, it has been decided in a great variety of circumstances that when questions of law and fact are so intermingled as to make it necessary, in order to pass upon the federal question, the court may, and should, analyze the facts. Even when the case comes to this Court from a state court this duty must be performed as a necessary incident to a decision upon the claim of denial of federal right. *Kansas City Southern Ry. Co.* v. *Albers Commission Co.,* 223 U. S. 573, 591; *Creswill* v. *Knights of Pythias,* 225 U. S. 246, 261; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585, 593; *Union Pacific R. Co.* v. *Public Service Commn.,* 248 U. S. 67, 69; *Merchants National Bank* v. *Richmond,* 256 U. S. 635, 638; *First National Bank* v. *Hartford,* 273 U. S. 548, 552, 553; *Fiske* v. *Kansas,* 274 U. S. 380, 385, 386.

*Fourth.* The application of these principles does not fail to take into account the distinctive authority of the State. In the performance of its essential function, in promoting the security and well-being of its people, the State must, of necessity, enjoy a broad discretion. The range of that discretion accords with the subject of its exercise. *Jacobson* v. *Massachusetts,* 197 U. S. 11, 31;

*Standard Oil Co.* v. *Marysville,* 279 U. S. 582, 584; *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 159. As the State has no more important interest than the maintenance of law and order, the power it confers upon its Governor as Chief Executive and Commander in Chief of its military forces to suppress insurrection and to preserve the peace is of the highest consequence. The determinations that the Governor makes within the range of that authority have all the weight which can be attributed to state action, and they must be viewed in the light of the object to which they may properly be addressed and with full recognition of its importance. It is with appreciation of the gravity of such an issue that the governing principles have been declared.

By virtue of his duty to " cause the laws to be faithfully executed," the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. His decision to that effect is conclusive. That construction, this Court has said, in speaking of the power constitutionally conferred by the Congress upon the President to call the militia into actual service, " necessarily results from the nature of the power itself, and from the manifest object contemplated." The power " is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Martin* v. *Mott,* 12 Wheat. 19, 29, 30. Similar effect, for corresponding reasons, is ascribed to the exercise by the Governor of a State of his discretion in calling out its military forces to suppress insurrection and disorder. *Luther* v. *Borden,* 7 How. 1, 45; *Moyer* v. *Peabody,* 212 U. S. 78, 83. The nature of the power also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for without such liberty to

make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the Executive in the exercise of his authority to maintain peace. Thus, in *Moyer* v. *Peabody, supra,* the Court sustained the authority of the Governor to hold in custody temporarily one whom he believed to be engaged in fomenting disorder, and right of recovery against the Governor for the imprisonment was denied. The Court said that, as the Governor " may kill persons who resist," he " may use the milder measures of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power. So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the Governor is the final judge and cannot be subjected to an action after he is out of office on the ground that he had not reasonable ground for his belief." In that case it appeared that the action of the Governor had direct relation to the subduing of the insurrection by the temporary detention of one believed to be a participant, and the general language of the opinion must be taken in connection with the point actually decided. *Cohens* v. *Virginia,* 6 Wheat. 264, 399; *Carroll* v. *Carroll's Lessee,* 16 How. 275, 287; *Myers* v. *United States,* 272 U. S. 52, 142.

It does not follow from the fact that the Executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary

is well established. What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions. Thus, in the theatre of actual war, there are occasions in which private property may be taken or destroyed to prevent it from falling into the hands of the enemy or may be impressed into the public service and the officer may show the necessity in defending an action for trespass. " But we are clearly of opinion," said the Court speaking through Chief Justice Taney, " that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. . . . Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified." *Mitchell* v. *Harmony*, 13 How. 115, 134. See, also, *United States* v. *Russell*, 13 Wall. 623, 628. There is no ground for the conclusion that military orders in the case of insurrection have any higher sanction or confer any greater immunity.

We need not undertake to determine the intended significance of the expression " martial law," and all its possible connotations, as it was employed in the Governor's proclamation. Nor are we concerned with the permissible scope of determinations of military necessity in all their conceivable applications to actual or threatened disorder and breaches of the peace. Fundamentally, the question here is not of the power of the Governor to proclaim that a state of insurrection, or tumult, or riot, or breach of the peace exists, and that it is necessary to call military force to the aid of the civil power. Nor does the question relate to the quelling of disturbances and the overcoming of unlawful resistance to civil authority. The question before us is simply with respect to the Gover-

nor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil. Instead of affording them protection in the lawful exercise of their rights as determined by the courts, he sought, by his executive orders, to make that exercise impossible. In the place of judicial procedure, available in the courts which were open and functioning, he set up his executive commands which brooked neither delay nor appeal. In particular, to the process of the federal court actually and properly engaged in examining and protecting an asserted federal right, the Governor interposed the obstruction of his will, subverting the federal authority. The assertion that such action can be taken as conclusive proof of its own necessity and must be accepted as in itself due process of law has no support in the decisions of this Court.

Appellants' contentions find their appropriate answer in what was said by this Court in *Ex parte Milligan,* 4 Wall. 2, 124, a statement as applicable to the military authority of the State in the case of insurrection as to the military authority of the Nation in time of war: " The proposition is this: That in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of *his will;* and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States. If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and

proper, without fixed or certain rules. The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law established on such a basis, destroys every guarantee of the Constitution, and effectually renders the military independent of and superior to the civil power. . . . Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish."

*Fifth.* The argument of appellants intimates, while it reserves the question, that it may be possible for the courts to call upon the Governor, after the alleged emergency has passed, to account for what he has done, but that they may not entertain a proceeding for injunction. The suggestion confuses the question of judicial power with that of judicial remedy. If the matter is one of judicial cognizance, it is because of an alleged invasion of a right, and the judicial power necessarily extends to the granting of the relief found to be appropriate according to the circumstances of the case. Whether or not the injured party is entitled to an injunction will depend upon equitable principles; upon the nature of the right invaded and the adequacy of the remedy at law. If the court finds that the limits of executive authority have been transgressed, and that in view of the character of the injury equitable relief by injunction is essential in order to afford the protection to which the injured party is entitled, it can not be said that the judicial power is fettered because the injury is attributable to a military order.

In the present case, the findings of fact made by the District Court are fully supported by the evidence. They leave no room for doubt that there was no military necessity which, from any point of view, could be taken to justify the action of the Governor in attempting to limit

complainants' oil production, otherwise lawful. Complainants had a constitutional right to resort to the federal court to have the validity of the Commission's orders judicially determined. There was no exigency which justified the Governor in attempting to enforce by executive or military order the restriction which the District Judge had restrained pending proper judicial inquiry. If it be assumed that the Governor was entitled to declare a state of insurrection and to bring military force to the aid of civil authority, the proper use of that power in this instance was to maintain the federal court in the exercise of its jurisdiction and not to attempt to override it; to aid in making its process effective and not to nullify it; to remove, and not to create, obstructions to the exercise by the complainants of their rights as judicially declared. It is also plain that there was no adequate remedy at law for the redress of the injury and, as the evidence showed that the Governor's orders were an invasion under color of state law of rights secured by the Federal Constitution, the District Court did not err in granting the injunction.

The judgment of the District Court is affirmed.

*No. 11, appeal dismissed.*
*No. 453, judgment affirmed.*