## SCHUELLER v. DRUM, Lieutenant General.
### No. 3151.

District Court, E. D. Pennsylvania.
Aug. 20, 1943.

C. Wilfred Conard, George M. Miller, Jr., and Thomas Waltz, all of Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., and J. B. Rettew, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., and Edward Ennis and John Burling, Sp. Assts. to Atty. Gen., for defendant.

GANEY, District Judge.

This is a petition for a declaratory judgment. The petition, in substance, alleges that the petitioner is a naturalized citizen of the United States, residing in Philadelphia; that on or about December 23, 1942, upon the request of military authorities of the United States she voluntarily appeared before them and testified, in answer to questions propounded to her concerning her membership in various German Clubs; that no charges were presented against her; that she only testified herself, and did not present the testimony of others, nor did she offer any rebuttal of any information which may have been in the possession of the Military Authorities; that on April 26, 1943, Lieutenant General H. A. Drum of the Eastern Defense Command and First Army of the United States issued and had served upon her, allegedly under authority vested in him under Executive Order No. 9066, and pursuant to a determination made in accordance with provisions of Paragraph 9A of Public Proclamation No. 2, Headquarters Eastern Defense Command and First Army, dated September 7, 1942, an individual exclusion order prohibiting her from entering or remaining in the eastern military area, which included the City of Philadelphia, after the expiration of ten days from the date of service, to wit: on and after twelve o'clock midnight Thursday, May 6, 1943; that it further advised her that failure to comply with the same would subject her to forcible expulsion and criminal penalty as provided by Public Law No. 503, approved March 21, 1942, 18 U.S.C.A. 97a; that the petitioner is a loyal citizen of the United States, deriving her citizenship through the naturalization of her husband, and has been a resident of the United States for thirty-two years; that for the past year thereof she has been lawfully conducting a restaurant located in an industrial and commercial area in the City of Philadelphia; that her son, George Schueller, twenty years of age, enlisted in the United States Navy and, being a minor, it was necessary to obtain petitioner's consent to said enlistment, which she readily gave; that she endeavored to ascertain the cause of her exclusion but was unable to obtain any information thereof, being advised that the facts were confidential; that no right of appeal exists from the said exclusion order and that compliance therewith, will result in the taking of her property as well as deprive her of her liberty without due process of law. The petition was later amended to make Lieutenant-General Drum a party defendant, and the prayer of the petition amended to request a declaratory judgment—in substance that the exclusion order was unconstitutional, as being violative of the due process clause. The petition was later amended to allege that the matter in controversy involved more than Three Thousand Dollars ($3,000), exclusive of interest and costs. The answer and amended answer denied that the controversy involved over Three Thousand Dollars ($3,000); that the petitioner failed to allege facts entitling her to declaratory or other relief; denied that the exclusion order was unlawful and averred that the petitioner was excluded because military necessity so required; that by virtue of the authority vested in the President of the United States, the petitioner was ordered excluded upon investigative reports and recommendations and upon the determination, that military necessity and fact required such action and that the exclusion order was made in good faith and without personal bias or prejudice and was not arbitrary, capricious or unreasonable.

A temporary restraining order was granted by the court prohibiting the defendant from taking any action with respect to the petitioner until the matter was legally determined. At the hearing the matter was considered in the nature of a bill in equity, and testimony was taken by both sides showing the whole course of the proceedings.

The government presented certain witnesses to testify to the fact that the petitioner voluntarily appeared in Philadelphia at the request of the Military Authorities and was examined concerning the range of her activities, and especially her membership in certain German Clubs; that she called no witnesses in her behalf, but merely answered the questions propounded to her by army officers, comprising a Hearing Board; that the questions asked of the petitioner were based on investigative reports of the Federal Bureau of Investigation; that the testimony of the petitioner coupled with the investigative reports

formed a basis of the Hearing Board's decision to recommend exclusion of the petitioner; that the whole file comprising the investigative reports and testimony of the petitioner was submitted to a Reviewing Officer and some fifteen other Reviewing Officers and Board of Review, including the United States Attorney, a specially designated representative of the Department of Justice, the Chief of Staff and finally the Commanding General of the Eastern Defense Command and First Army, Lieutenant General Drum, who entered the order excluding the petitioner from the eastern defense area. It was further testified that a recommendation not to exclude, at any of the stages heretofore indicated, prevented the case from going forward and resulted either in its termination or further investigation. Testimony was also offered by the Assistant Chief of Staff of the Eastern Defense Command as a military expert on matters of military intelligence. He stated that the Eastern Military area was a sensitive military area consisting of forty percent (40%) of the population of the United States and an even larger percentage of the alien enemy population and of the population of enemy alien ancestry; that over forty percent (40%) of war production and very large majority of war shipments, material and men to active theatres of military operations went through the ports of this military area; that the area could be attacked by surface vessels and submarines as well as by aircraft.

Executive Order No. 9066 of the President of the United States was offered, providing in part as follows:

"Authorizing The Secretary Of War To Prescribe Military Areas

"Whereas the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U. S.C., Title 50, Sec. 104):

"Now, Therefore, by virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. * * *"

There was introduced also in evidence by the government Public Proclamation No. 1, issued May 16, 1942, defining the area of the Eastern Defense Command and the First Army, which embraces Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, North Carolina, South Carolina, Georgia, Part of the State of Florida, and The District of Columbia, are established as the Eastern Defense Command under Lieutenant-General. H. A. Drum. The functional subdivisions of the Eastern Military Area is subdivided into three Corps Areas; the Third Corps Area, with Headquarters at Baltimore, Maryland, embraces Pennsylvania, Maryland and Virginia. Public Proclamation No. 2, dated September 7, 1942, was introduced in evidence in which paragraph 9A provides as follows: "Any person whose presence in the Eastern Military Area or any part or zone thereof, is deemed dangerous to the national defense by the Commanding General of the Eastern Defense Command and First Army will be ordered excluded from the military area or such part or zone thereof by the Commanding General Eastern Defense Command and First Army * * *".

Congress by Act of March 21, 1942, 18 U.S.C.A. § 97a, provided: "That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act

was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable" to fine or imprisonment, or both.

The petitioner denied any subversive activities on her part, said she was a loyal American citizen, which was corroborated by several other witnesses, and explained her part in various German Clubs in which she had been active. The petitioner was at no time confronted with witnesses who gave testimony against her, nor was she represented by counsel, nor was she at any time given any specification of the charges against her upon which an order of exclusion might be founded.

■ The contention of the petitioner is twofold, (1) that there was an improper delegation of legislative power by the Congress to the Commander of the Eastern Military Area in authorizing him to impose the challenged regulation, and (2) that the exclusion order was violative of the due process clause of the Fifth Amendment of the Constitution. With respect to the first contention it must now be deemed settled, since Hirabayashi v. United States, 63 S.Ct. 1375, 87 L.Ed. ——, June 21, 1943, that Congress in enacting the Act of March 21, 1942, ratified and confirmed Executive Order No. 9066 of February 19, 1942, and that in so doing there was no improper delegation of legislative power. The question then resolves itself into one, not of congressional power to delegate to the President, the promulgation of the Executive Order, but rather whether acting in cooperation, Congress and the Executive, have constitutional authority, to impose the exclusion order here complained of. In other words, decision must be made as to whether Congress and the Executive together, could leave it to the designated military commander of this area, to appraise the relevant conditions then existing, and on the basis of that appraisal say, whether under all the circumstances, the time and place were appropriate for the exclusion order. The consideration of this question concerns itself, with whether or not the order was an appropriate means of carrying out the executive order for the "protection against sabotage and espionage" to national defense material, premises and utilities.

■ By virtue of his duties as Commander in Chief of the Army and Navy, it is the duty of the President and, together with Congress, jointly to see that war is successfully waged. This power is not only confined to actual engagements on fields of battle, but embraces every aspect of national defense including the protection of war materials as well as the members of the armed forces from injury and danger. In the furtherance of the successful prosecution of war, the President is properly vested with a discretion to determine whether the exigency of war requires that certain military restrictions be placed upon certain individuals. Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537. However, as pointed out by Chief Justice Hughes in Sterling v. Constantin, 287 U.S. 378, 399, 53 S.Ct. 190, 196, 77 L.Ed. 375: "The nature of the power also necessarily implies that there is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order, for, without such liberty to make immediate decisions, the power itself would be useless. Such measures, conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance, fall within the discretion of the executive in the exercise of his authority to maintain peace". However, it does not follow that all actions taken by the Executive are conclusive, for he further states, 287 U.S. at page 401, 53 S.Ct. at page 196, 77 L.Ed. 375: "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions". As Chief Justice Taney stated in Mitchell v. Harmony, 13 How. 115, at page 134, 14 L.Ed. 75, where private property in the actual theatre of war was taken to prevent its falling into the hands of the enemy: "But we are clearly of opinion, that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. * * * Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified".

The position contended for by the government is one of no ordinary magnitude and its exercise by Military Authorities engenders the jealousy of a free people.

The statement of the court in Ex parte Milligan, 4 Wall. 2, 124, 18 L.Ed. 281, where a civilian was arrested by order of the Commanding General of an area in the State of Indiana for a war crime and tried by military tribunal and sentenced to death and where habeas corpus was allowed to obtain his release, seems to me very pertinent: "The proposition is this: That in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has .the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States. If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules. The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law". As has been well said when the Executive "further directs interferences with liberty or property—measures normally beyond the scope of governmental power, which are lawful if at all only because an abnormal situation has made them necessary and appropriate—it is of the very essence of the rule of law that the executive's ipse dixit is not of itself conclusive of the necessity".*

While it is true that there was testimony that the area in which the petitioner resided was a sensitive one, and the center of great industrial activities closely connected with the war, and that she was a member of a number of German Societies, some of which the government held to be subversive and that she had written a letter to Hitler, calling his attention to certain needs that were in her opinion requisite for the people in a certain part of Germany, which she had observed as a result of her visit there in 1931, and which letter had ended with the greeting, "Heil, Hitler", there was not shown such a danger as would warrant denial to the petitioner of her right to due process of law. The normal civilian life of the area was being pursued; commercial and industrial activities, their tempo heightened by a demand for greater production, ·were in private ownership; the courts both federal and state were open and functioning as well as all the administrative and executive departments of government, and it could not be honestly said that ordinary law did not adequately secure public safety and private rights. Accordingly, it would seem to me that Congress "cannot authorize the executive to establish by conclusive proclamation the very thing which, upon familiar principle, would have been the subject of judicial scrutiny".*

While it can be stated that the President must have a wide latitude of action when the characteristics of modern warfare are considered, mobility on land, surprise from the air and sea, treachery of sabotage and the preparations of fifth columns; and while it may be that the dictum in Ex parte Milligan, supra, that "martial law cannot arise from a threatened invasion", must be reappraised in the light of man's ingenuity to wage modern .war; and while I am not unmindful that the issuance of the proclamation by the Commander of the area is some evidence of the finding of the necessity for his assuming control of the functions of civil government, yet where there is a direct interference as here with one's liberty and property, conduct normally beyond the scope of governmental power, such action could only be justified, a constitutional guarantee of freedom can only be abridged, when the danger to the government is real, impending and imminent. The war power, distributed between Congress and the President, comprehends all that is requisite to wage war successfully. The proper adjustment between judicial power and administrative action, in time of war, is extremely delicate in nature and cannot admit of precise definition. Every circumstance and condition must weigh in the balance, and the true criterion will always give effect to the type and nature as well as the nearness or proximity

* Law of Martial Rule, Charles Fairman, 55 Harvard Law Review, 1272.

of the danger to government, as against the particular constitutional guaranty trespassed, whether it be of a high or low order. Suffice it to say, that the factual bases do not obtain here, which would warrant the abridgement of petitioner's constitutional rights.

A decree may be entered in conformity with this opinion.