**SCHERZBERG v. MADERIA, Lt. Colonel, Cavalry, U. S. Army, et al.**

**No. 3351.**

District Court, E. D. Pennsylvania.

July 24, 1944.

Wesley H. Caldwell, of Philadelphia, Pa., for plaintiff.

Gerald A. Gleeson, U. S. Atty., and J. Barton Rettew, Asst. U. S. Atty., both of Philadelphia, Pa., and Edward Ennis and John L. Burling, Sp. Assts. to Atty. Gen., for defendants.

GANEY, District Judge.

This is a bill in equity filed by the plaintiff seeking an injunction against the defendants from executing an exclusion order issued against the plaintiff. An answer was filed and the case was heard as of final hearing.

In substance it is alleged that the plaintiff is a citizen of the United States; that the defendants are officers of the United States Army; that the action arises under the Fourth, Fifth and Sixth Amendments to the Constitution; that the plaintiff was served by the defendants with an individual exclusion order, ordering him to leave the states comprising the Eastern Seaboard of the United States without plaintiff having committed any act which would subject him to prosecution; that he has been deprived of his property and liberty without due process of law; that the action of the defendants was arbitrary and illegal; that the United States was not under martial law, and the plaintiff not subject to military authorities; that unless enforcement of the order is restrained, immediate and irreparable injury and damage would result to him.

By stipulation it was agreed that the amount in controversy exceeded, exclusive of interest and costs, the sum of Three Thousand Dollars ($3000), and an answer filed admitted the service of the exclusion order as well as the fact that the plaintiff was not being charged with the commission of any act, which would subject him to prosecution, yet denied the action of the defendants as arbitrary and illegal; it was denied that it deprived the plaintiff of any constitutional right; that by virtue of the authority vested in the Commanding General, Eastern Defense Command, the President of the United States and Secretary of War, and pursuant to Public Proclamation No. 1 and 2 plaintiff was ordered excluded upon investigative reports and recommendations; that said order was in good faith without personal bias or prejudice, and upon determination that military necessity required such exclusion.

It developed at the trial that the plaintiff is a naturalized citizen, having been born in Germany, leaving there in 1909 to work in the Panama Canal Zone and then came to the United States in 1918; that since he left Germany he made four trips there, in 1913, 1932, 1936 and his last trip in 1939; for the past twenty-four (24) years he has lived and been engaged in the business of buying, repairing and selling houses; that he has two sons, one twenty and the other eighteen, both born in Philadelphia and American citizens, although trained to speak German while at home. Before going to Germany in 1939, the plaintiff had previously made arrangements to leave his sons in Germany, there to study, because he wished them to combine theoretical knowledge with actual practical knowledge which they could obtain he alleged only at German institutions; that he was anxious that they obtain this knowledge because he intended to engage in an export business in connection with "folkswagons," of which there was a lot of talk in Germany, as he said, "everyone should buy one of them, as it was Hitler's idea." The plaintiff left his sons in Germany and made no inquiry or effort to secure their repatriation, although he did apply for a passport to go to Germany in 1940, allegedly to bring his sons back, but the State Department refused him the same. It was testified that previous to the entry of the United States in the war, plaintiff hoped that Germany would win and that he thought the British catastrophe at Dunkirk was "a good thing." After the United States declared war on Germany, the plaintiff sent packages to individuals who were interned as enemy-aliens and contributed the sum of Two or Three Hundred Dollars to German prisoners of war, and merely Three, Four or Five Dollars to the American Red Cross.

Before his last trip to Germany in 1939, he invested approximately thirty-five thou-

sand dollars ($35,000) in Rueckwanderer or remigration marks; these particular marks were only good in Germany and had to be used in the purchase of commodities within the German nation; twenty-five thousand dollars ($25,000) thereof he put in trust for his sons' education, and ten thousand dollars ($10,000) he used to purchase a home for himself and the boys in Bavaria. In order to purchase Rueckwanderer marks, it was testified that the applicant had to be in good standing with the Nazi authorities, and be checked by the German Consul at the place where they lived. He was very active in German Societies, and one time President of the Frankford Schulverein, and was their delegate to the Deutsche Amerikanische Zentralbund; he was also a member of the Philadelphia Rundfunk or Radio Club, which was engaged largely in the propaganda of advertisements of Nazi Germany. On the plaintiff's last trip to Berlin he met one George Gerhardi, the President of the Philadelphia Rundfunk Club, who took him to a German Government broadcasting station where Gerhardi spoke by shortwave to his friends in the United States. The plaintiff at various times addressed members of the Rundfunk Club where moving pictures were shown at times, including Nazi war pictures. The Rundfunk Club had as its main function, promoting the listening to German propaganda broadcasts and was instrumental in having German programs broadcast over local stations. The plaintiff had installed in a station wagon which he owned, a shortwave radio, built in the rear end of the car, and one-quarter horsepower gas engine installed to supply the added electricity which was necessary. This car the plaintiff took abroad with him in 1939, as well as to Panama Canal and Mexico City in 1941. He was also a member of the Deutschhorst Country Club and the Lake Mathilda Association, about one-half the members of the Lake Mathilda organization being members of the German-American Vocational League, otherwise known as the Deutsche Amerikanische Berufgemeinschaft or DAB, which was a National Socialist organization in Germany and a branch of the Deutsche Arbeits Front—German Labor Front—headed by Dr. Robert Ley. The nature of the DAB as required by German law, was the promotion of the principles of the Third Reich and National Socialism abroad. The government sought to show that it was a basic principle of the Nazi Government that German organizations abroad should follow the "leadership" principle, the Aryan principle, and other principles of National Socialism; also that on the plaintiff's last visit abroad, he spent some time at the Ausland Institute, located at Stuttgart, at which was disseminated all the various principles of National Socialism for the various countries in the entire world, the propaganda branch of which was headed by Dr. Goebbels.

It was further shown that the Eastern Military Area was under the Eastern Defense Command which was established in March, 1942, as a tactical and administrative unit. The Eastern Military Area, the boundaries of which are coterminous for that portion of the Eastern Defense Command, which lies within the boundaries of continental United States, includes the Atlantic coastal states, plus Vermont, Pennsylvania and the District of Columbia. At the time of its proclamation as such, General Drum stated that the Eastern Military Area was "subject to espionage and acts of sabotage" and required the adoption of military measures necessary to establish safeguards.

On November 18, 1943, the area from which the plaintiff was ordered excluded, was reduced to a coastal strip along the entire Eastern Seaboard, approximately 40 to 50 miles wide, and in Pennsylvania embraced the counties of Bucks, Montgomery, Chester, Delaware and Philadelphia. This reduction in area was ordered to afford a minimum of inconvenience and although the danger of invasion had decreased, it was asserted that the danger from espionage and sabotage was still present and the reduction of the area had in mind the better protection against these dangers. It was testified further on behalf of the government that the area was a particularly sensitive area, because over its borders information could be transmitted directly to the German government; that direct communication was possible with enemy ships and possible enemy agents working on neutral vessels docking on East Coast ports; that great numbers of our troops necessary for the European theatre were convoyed out of East Coast ports and as invasion preparations mounted increasingly larger numbers of troops would have to be shipped through these ports, and further that the organizational and training status of the army had

now passed, and the operational period was approaching when great masses of troops would be continually shifted about on the East Coast and finally convoyed to the eastern theatre of operations; that the individual exclusion program as here put into effect was in accordance with the fundamental principles of counterintelligence; that written notice had been given to the plaintiff to appear before a Military Hearing Board, informing him that an investigation was then in progress to determine whether or not he should be excluded from the Eastern Military Area, pursuant to Executive Order No. 9066; that he appeared before the Board and gave testimony, and although given an opportunity he produced no witnesses on his behalf; that while not presented with any formal specifications of charges, he understood the purposes for which the Hearing Board was sitting and what its nature was. The testimony also detailed the exclusion process through the various reviewing officers and boards until it finally reached the Commanding General of the Third Service Command, who recommended exclusion in the case which was forwarded with supporting recommendations and documents to the Eastern Defense Command.

The question posed for solution here is the same question as was presented to this Court in Olga Schueller v. H. A. Drum, 51 F.Supp. 383, and involves the construction of Public Law 503 of the 77th Congress, 2d Sess., which provides as follows:

"Whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive Order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense." March 21, 1942, ch. 191, 56 Stat. 173, 18 U.S.C.A. § 97a.

and Executive Order No. 9066, 7 Federal Register 1407, promulgated by the President on February 19, 1942, provides, insofar as here relevant:

"Whereas the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U.S. C., Title 50, Sec. 104):

"Now, therefore, by virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary, in the judgment of the Secretary of War, or the said Military Commander, and until other arrangements are made, to accomplish the purpose of this order. The designation of military areas in any region or locality shall supersede designations of prohibited and restricted areas by the Attorney General under the Proclamations of December 7 and 8, 1941, and shall supersede the responsibility and authority of the Attorney General under the said Proclamations in respect of such prohibited and restricted areas.

"I hereby further authorize and direct the Secretary of War and the said Military Commanders to take such other steps as he or the appropriate Military Commander may deem advisable to enforce compliance with the restrictions applicable to each Military Area hereinabove authorized to be designated, including the use of Federal troops and other Federal Agencies, with authority to accept assistance of state and local agencies."

The same question has been raised in Massachusetts and in California, and has been passed upon by the Circuit Court of Appeals for the Ninth Circuit, Fred Toyosaburo Korematsu v. United States of America, 9 Cir., 1943, 140 F.2d 289, Id., 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497. This court has attempted to approach the question here raised wholly disassociated from any previous convictions formed in the above mentioned Schueller case, fully aware of the importance of the principle involved. However, while the testimony here offered is stronger in character and greater in amount, and although the Government's contention has been cogently argued and ably presented, I am of the opinion that the prayer of the bill should be granted.

While each case must be bottomed on its own peculiar facts, it seems to me the same question recurs continually through all of the cases presently decided, to wit: In what instances and under what circumstances, if any, can Congress and the Executive in the prosecution of their power of waging war, infringe the constitutional guarantees of individuals, in other words, what are the limitations, if any, of their power to wage war? It must be now taken for granted that the Constitution commits to both the Executive and to Congress the exercise of the war power in all its amplitude and of necessity gives them a broad scope for the exercise of their judgment and discretion in determining the nature and extent of the threatened injury or danger. Ex parte Quirin, 317 U.S. 1, 28, 29, 63 S.Ct. 2, 87 L.Ed. 3; Martin v. Mott, 12 Wheat. 19, 29, 6 L.Ed. 537; Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774. While the court says in the Hirabayashi case, supra: "Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

I feel, nevertheless, that this portion of the opinion should be read in the light of the existing inquiry which was under scrutiny in the case. On page 101 of 320 U.S., on page 1386 of 63 S.Ct., 87 L.Ed. 1774, thereof, the court stated as follows:

"Our investigation here does not go beyond the inquiry whether, in the light of all the relevant circumstances preceding and attending their promulgation, the challenged orders and statute afforded a reasonable basis for the action taken in imposing the curfew. We cannot close our eyes to the fact, demonstrated by experience, that in time of war residents having ethnic affiliations with an invading enemy may be a greater source of danger than those of a different ancestry. Nor can we deny that Congress, and the military authorities acting with its authorization, have constitutional power to appraise the danger in the light of facts of public notoriety. We need not now attempt to define the ultimate boundaries of the war power. We decide only the issue as we have defined it—we decide only that the curfew order *as applied, and at the time it was applied,* was within the boundaries of the war power. In this case it is enough that circumstances within the knowledge of those charged with the responsibility for maintaining the national defense afforded a rational basis for the decision which they made. Whether we would have made it is irrelevant." (Italics our own.)

Accordingly it can readily be seen that the issue was not alone factually different, in that the court in that case had under construction the validity of a curfew order and here an evacuation order, but further that the court was in no wise attempting to define the ultimate limits of the war power, but merely the narrow question of the validity of a curfew order in its attendant setting.

In other words, I feel that what the allowable limits of military discretion are, is still a judicial question, as stated by Chief Justice Hughes in Sterling v. Constantin, 287 U.S. 378, 401, 53 S.Ct. 190, 77 L.Ed. 375, and accordingly, I feel it is for the judicial power to say whether or not the decisions made by the Executive through the Military Commander backed by legislative authority had a rational basis under given circumstances. Here, I feel that the decree as promulgated, at the time it was promulgated, did not have such a rational basis in that I do not feel that any such situation obtained on the Eastern Seacoast for the exclusion order, at the time it was made, as existed on the Western Coast, at the time the curfew order was installed. In that instance an entire race

was suspect, the Japanese, a race which, though some of its members had become American citizens, had never been absorbed into the customs and traditions of the country, and who were possessed of a dual citizenship at the same time giving an allegiance to Japan as well as to the United States. In that instance mass action was contemplated, here, an individual exclusion program is carried out.

In the present instance, it is admitted that the danger of invasion has decreased, although it is asserted that the opportunity for sabotage and espionage have increased by reason of the greater production in war materials and the greater number of troops being shifted through the Eastern Seaboard and eventually convoyed to the Eastern theatre of operations. However, it seems to me that the reduction in the coastal evacuation area, while in no sense controlling either way, in no wise helps the government's case, for while there was an intensity of production and great movements of masses of troops, the inescapable fact remains that the government felt that a smaller land area was permissible from which evacuations were to be made.

 True, it is in Fred Toyosaburo Korematsu v. United States, supra, the only time the matter has been reviewed by a Circuit Court, the court therein stated [140 F.2d 290]:

"However, the Supreme Court held that under the Constitution the government of the United States, in prosecuting a war, has power to do all that is necessary to the successful prosecution of a war although the exercise of those powers temporarily infringe some of the inherent rights and liberties of individual citizens which are recognized and guaranteed by the Constitution."

It is to be remembered that this case involved the exclusion of a native born citizen of the United States of Japanese ancestry, as well as all the attendant circumstances which were then existant on the Pacific Coast by reason of the racial problem there involved. To hold that this broad principle so enunciated can be applied generally and in particular to the situation here obtaining, I cannot agree. I hold that exclusion orders from military areas are within the war powers of Congress and the Executive acting together, as proper means of carrying out an executive order for the protection of military areas against sabotage and espionage, I do not feel that the circumstances obtaining here were appropriate for such order as I believe that even in the prosecution of a war, the infringement of inherent rights and liberties of the individual guaranteed by the constitution should only be permitted when a situation in an area exists which is fraught with some degree of immediate danger to the welfare of the country, as stated by this Court in Olga Schueller v. H. A. Drum, supra [51 F. Supp. 387]:

"The war power, distributed between Congress and the President, comprehends all that is requisite to wage war successfully. The proper adjustment between judicial power and administrative action, in time of war, is extremely delicate in nature and cannot admit of precise definition. Every circumstance and condition must weigh in the balance, and the true criterion will always give effect to the type and nature as well as the nearness or proximity of the danger to government, as against the particular constitutional guaranty trespassed, whether it be of a high or low order."

Here, every normal phase of civilian life was being engaged in, and in addition, the record is barren of any actual instance of espionage or sabotage in the particular area in which the plaintiff is situate. Accordingly as I have indicated, an entirely different situation obtains here, than that which was present in the Hirabayashi case, supra. Here, at most, is shown an opportunity for the exercise of espionage and sabotage, or more particularly, that the reduced military area affords abundant opportunity for the engagement in either of these practices by a plaintiff, such as we have here, who seems more imbued with Nazi principles than with American ideals, and who, it appears, gives but a grudging allegiance to a land and system under which he has lived and prospered. However, this is not enough. There must be existing in the area some immediacy of danger to the welfare of the country. An order such as here under scrutiny, must be laid in a society, engaged in a war, whose setting and background is, either already in a disturbed status—whose homefront is threatened—or one in which there is every immediate likelihood of such a happening, as opposed to a society engaged in war, having, what one might term a static equilibrium such as exists in the

instant case, with a normal home-front, where discipline under the civil law is ample to cope with every emergency arising under the war effort.

The parties will submit a decree in accordance with this opinion.