**EBEL v. DRUM et al.**
Civil Action No. 2290.

District Court, D. Massachusetts.
Sept. 20, 1943.

190

Jacob Friedberg and J. C. Johnston, both of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., of Boston, Mass., and John L. Burling and Nanette Dembitz, Attys. War Division Department of Justice, both of Washington, D. C., for defendants.

FORD, District Judge.

Lieutenant General Hugh A. Drum of the United States Army, Military Commander of the Eastern Military Command, on April 23, 1943, issued an "Individual Exclusion Order" prohibiting the plaintiff from entering or remaining in the Eastern and other military areas comprising a large portion of the United States which had been designated in public proclamations by commanding generals throughout the United States.

The plaintiff brought this present complaint which seeks to restrain the defendants [1] from expelling the plaintiff from the Eastern Military Area where he resides, "or from in any other manner interfering with or circumscribing the liberty and freedom without due process of law", with a further prayer that the exclusion order be declared void. In his complaint the plaintiff alleges he has at all times been loyal to the United States.

No question is raised by the defendants with respect to the jurisdiction of this court concerning the matters involved in the present case.

Although the plaintiff's complaint alleges that his rights under the Fifth and Sixth Amendments to the Constitution have been and are about to be violated, yet at the time of final hearing—request for a preliminary injunction being waived by stipulation of the defendants that the liberty of the plaintiff would not be interfered with until the decision of this court on the merits had been handed down—the plaintiff through his counsel stated that his sole reliance for relief was now based on the

---

[1] The defendant, Sherman Miles, is a Major General of the United States Army, commanding the First Service Command, with headquarters at Boston, where the plaintiff has his residence; the defendant, Armand Lamoureaux, is a Lieutenant Colonel of Infantry serving under General Miles.

due process clause of the Fifth Amendment to the Constitution of the United States.

The defendants' answer, in sum, asserts that the exclusion order was justified by military necessity and that neither the action of the military commander in issuing the order, nor any action contemplated as a consequence of its issuance, in any way has or will violate any rights accorded the plaintiff under the Constitution of the United States.

The evidence at the hearing was documentary and oral, and it showed the following facts:

War was declared by Congress against Japan December 8, 1941; against Germany and Italy on December 11, 1941.

On February 19, 1942, the President issued Executive Order No. 9066, 7 Fed.Reg. 1407, reciting: " * * * the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U.S.C., Title 50, Sec. 104 [50 U.S.C.A. § 104])." By virtue of the authority vested in him as President and Commander in Chief of the Army and Navy, the President purported to "authorize and direct the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe the military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion".

On April 22, 1942, the Secretary of War designated Lieutenant General Hugh A. Drum as Military Commander of the Eastern Defense Command [2] and he directed the Military Commander to carry out the duties and responsibilities imposed by Executive Order No. 9066 for that portion of the United States embraced in the Eastern Defense Command.

On May 15, 1942, General Drum promulgated Proclamation No. 1, reciting: " The present situation requires as a matter of military necessity the establishment, in the territory embraced in the Eastern Defense Command within the continental United States, of Military Areas, and for that purpose, I do hereby prescribe all of the territory in the several States of the United States lying east and northeast of the westerly boundary line of the Eastern Defense Command, including the States of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, North Carolina, South Carolina, Georgia, part of the State of Florida, and the District of Columbia, to be a Military Area and to be designated as the Eastern Military Area".

On September 7, 1942, General Drum promulgated Public Proclamation No. 2, reciting that a person whose presence in the Eastern Military Area is deemed dangerous to the national defense will be excluded therefrom.

The Congress by the Act of March 21, 1942, 18 U.S.C.A. § 97a, 56 Stat. 173, provided that: "Whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor * *' *."

On April 23, 1943, General Drum issued the exclusion order involved here, reciting that the action was taken pursuant to a determination made in accordance with the provisions of paragraph 9a of Public

---

[2] The Eastern Defense Command comprises that portion of the continental United States east of the following line: The Ohio-Pennsylvania boundary, the West Virginia-Pennsylvania boundary, the West Virginia-Maryland boundary, the West Virginia-Virginia boundary, the Kentucky-Virginia boundary, the Tennessee-Virginia boundary, the Tennessee-North Carolina boundary, the Tennessee-Georgia boundary, the Alabama-Georgia boundary to its junction with Florida thence south along the Apalachicola River.

Proclamation No. 2 (supra) and was dictated by military necessity. By its terms it prohibited the plaintiff after expiration of ten days from the date of its service from entering or remaining in the Eastern Military Area; the Western Military Areas (Arizona, California, Oregon and Washington); Military Area No. 1 of Florida; Alabama, Mississippi, Louisiana, Texas, and New Mexico; the Sault Ste. Marie Military Area (Chippewa and Mackinac Counties, Michigan, and their contiguous islands and waters). A further requirement in the exclusion order was that the plaintiff should report in three days after the service of the order to the First Service Command for the purposes of being photographed, fingerprinted, and furnishing a specimen signature. There were other requirements not material here with an admonition that failure to comply would subject the plaintiff to forcible expulsion and prosecution under Section 97a, 18 U.S.C.A.

On April 29, 1943, the plaintiff instituted these proceedings.

At the hearing in this court, the evidence introduced through officers of Military Intelligence showed that the Eastern Military Area since the beginning of hostilities and up to the present date is known as a "sensitive area" (an area in which are located large concentrations of war-time installations or activities and also an area in which observation can be made and information valuable to the enemy can readily be obtained); that the area is open to offensive action and maneuvers; that it is exposed to direct attack by air and because of tremendous amount of war installations and utilities exposed to sabotage. The evidence further showed that the area covering less than 14% of the land area of the United States includes about 40% of the population and over 60% of all plants manufacturing tools. There is also contained in this area a major portion of war-time installations and naval activities. It is the seat of the federal government and installations of management over communications. There are vast freight movements of supplies and equipment passing over its transportation lines; ship movements of men and supplies with their convoys and naval activities are easily discernible in this area.

At the close of the evidence showing the "sensitivity" of the Eastern Military Area, the defendants introduced in evidence the original record in the exclusion proceedings before the different agencies of the Eastern Defense Command from which the names of confidential informants, the discussion of the source of their information, and other reports revealing information and investigation technique, such as reports of the Federal Bureau of Investigation, were deleted. This record showed that for sometime prior to the issuance of the exclusion order by General Drum the plaintiff's pro-Nazi activities—all before the commencement of the present hostilities—had been reviewed and passed upon in twenty-four separate steps.

In the intermediary stages of the proceedings, the plaintiff was afforded a hearing. On September 25, 1942, at Boston, before a board comprised of three officers of high rank, he was given the opportunity of showing cause why he should not be excluded from the Eastern Military Area. Previous to this hearing, notice had been sent on September 21, 1942, and received by the plaintiff in which he was notified that an inquiry was in progress "to consider the question whether military necessity" required his exclusion from the Eastern Military Area and that he would be afforded full opportunity to produce witnesses and present evidence in his own behalf. He had no knowledge before he received this notice that an investigation was being conducted. The notice further stated he could refuse to answer any question without assigning a specific reason for the refusal and he was given permission to have an adviser accompany him. No opportunity for cross-examination of witnesses was afforded him, nor was he informed of the nature and cause of the accusations against him. At this hearing, the plaintiff answered all the questions put to him and he presented witnesses as to his loyalty to the United States, and furnished some character letters from business associates. The subject matters discussed at the hearing were the facts and circumstances reflected in the various confidential reports made by the investigative agencies acting for the military authorities, among which were the Military Intelligence Division, Federal Bureau of Investigation, Naval Intelligence, and Immigration and Naturalization authorities. It was upon these reports that the military authorities, and finally General Drum, relied in reaching the conclusion that military necessity

demanded the exclusion of the plaintiff from the Eastern Military Area, on the ground he was found to be "dangerous to the national defense".

The pre-hearing investigations contained in the file upon which General Drum acted and which was presented in evidence disclosed the following circumstances, all arising before Pearl Harbor, and most of which were admitted to be true by the plaintiff when brought to his attention at the hearing. Of course, in all fairness to the plaintiff, it should be stated that at no time was there any concurrence by him in the significance now attached to the facts by the authorities.

The file disclosed that:

(1) The plaintiff resides with his second wife at 139 Walworth Street, Boston, and formerly resided at 113 Sheridan Street, Boston. He is a cabinetmaker by trade and the owner of the Cambridge Woodcraft Company, of Cambridge, Massachusetts, and on April 13, 1942, was awarded a government contract to make secret parts for ships being built for the United States Navy. This contract is still in existence. He was born in Germany, January 7, 1890, and lived there until he came to the United States in 1929. He served in the German Army from 1914 to 1918 and was awarded the German Iron Cross and medals from Austria and Hungary for his service in the First World War. In 1932, the plaintiff visited Germany for a short time. He became a naturalized citizen in 1936. His parents were born in Germany and are, in all probability, living there at the present time. He has a brother and a sister, two sons, one of whom is nineteen years of age and probably now in the Germany Army; also, his first wife, daughter, and uncles reside in Germany.

(2) The plaintiff was friendly with certain officers and crew of the German tanker "Pauline Friederich", interned in Boston and later sabotaged to prevent its use by the United States, visited them on board and later entertained them at his home.

(3) The plaintiff frequently visited the German Consul in Boston before it was closed and in 1939 prevailed upon the Consul to strike his eldest son's name from the list of those who had been classed as deserters by the German government. This youth is twenty-three years of age, an alien, and has not yet volunteered for service in the United States Army. He takes the position that he will not serve in the war against Germany. In addition to this, the plaintiff attended all the official parties at the German Consulate before the present war.

(4) The plaintiff was President of the Kyffhaeuser Bund, Boston Branch, from 1938 or 1939 to its dissolution in January, 1942. This bund was one of the foremost international German societies in America in its encouragement of the military spirit and keeping alive the love of Germany in the hearts of former German soldiers and civilians. The plaintiff's chapter of the Kyffhaeuser collected about $2,000 under a permit issued to it in 1939 by our State Department. This money was forwarded to the Bund Headquarters at Philadelphia and from there it was sent to Germany. The record disclosed that a great many of the meetings were held in the plaintiff's home and that the plaintiff was the most active person in Boston in raising funds for the German War Relief.

(5) Sometime in 1941 the plaintiff met at a German Club in Boston an escaped German prisoner from Canada.

(6) He was formerly a member of the Stahlhelm, an organization dissolved by Hitler by decree in 1935 and succeeded generally in the United States by the Kyffhaeuser Bund.

### Conclusions of Law.

Executive Order No. 9066, which authorized the military commanders "to prescribe military areas * * * from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions * * * the appropriate Military Commander may impose in his discretion", was ratified and confirmed by Congress by the Act of March 21, 1942. Hirabayashi v. United States, 63 S.Ct. 1375, 87 L.Ed. 1774, U. S. Supreme Court, June 21, 1943. Thus, the exclusion order involved in this case was imposed by the joint action of Congress and the Executive and the first question to be determined is whether the national government has constitutional power to issue exclusion orders of the nature described here as war measures. There is no question involved here with respect to a power exercised after martial law has been proclaimed or is in existence as a consequence of military necessity. Cf. Ex parte Milligan, 4 Wall. 2, 18 L.Ed. 281.

The power to wage war is conferred on the Congress and the Executive under Articles I and II of the Constitution. As stated in United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302: "From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law". In general, it is the power "to use all means calculated to weaken the enemy and to bring the struggle to a successful conclusion". 3 Willoughby, The Constitution of the United States, Sec. 1033; see Charles Evans Hughes, War Powers Under the Constitution, 42 A.B.A. Reporter, 232. The war power covers all phases of attack and defense and the granting of this power to the national government necessarily carries with it a "wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it". Hirabayashi v. United States, 63 S.Ct. at page 1382, 87 L.Ed. 1774. The court there went on to say "where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs". Thus, it may well be that orders excluding from military areas under warrantable circumstances persons deemed dangerous to the national defense are proper means to prevent the happening of the evils Congress sought to prevent. The plaintiff made no contention that exclusion orders—preventive in their nature—were not appropriate means to protect military areas from espionage and sabotage.

In the Hirabayashi case a proclamation pursuant to Executive Order No. 9066 in imposing a curfew [3] on all persons of Japanese ancestry on the West coast was held to be a valid exercise of the war power of the Congress and the Executive.[4] The Supreme Court stated that " * * * our inquiry must be whether in the light of all the facts and circumstances there was any substantial basis for the conclusion, in which Congress and the military commander united, that the curfew as applied was a protective measure necessary to meet the threat of sabotage and espionage which would substantially affect the war effort and which might reasonably be expected to aid a threatened enemy invasion". 63 S.Ct. at page 1383, 87 L.Ed. 1774. After review of all the relevant data, the court concluded there was a danger of sabotage by citizens of Japanese ancestry and that the curfew order, though a restriction on personal liberty, was a proper and reasonable measure against the threat of sabotage and espionage. This case upheld an exercise of the war power although it also involved discriminatory treatment of citizens of the United States on the basis of racial origin —a circumstance ordinarily sufficient to invalidate it except as an exercise of the war power at a time of great emergency. Cf. Yu Cong Eng v. Trinidad, 271 U.S. 500, 524–528, 46 S.Ct. 619, 70 L.Ed. 1059; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. There is no such question of discrimination involved in this case. The plaintiff Ebel was not ordered excluded because he was a German or because he was a naturalized citizen, but only on the ground he was dangerous to the national defense.

There is involved in the instant case action by the military authorities acting under the authority of Congress which imposed a restraint upon personal liberty far more drastic than that involved in the curfew order in the Hirabayashi case. But the fact, in and of itself, that a restraint upon personal liberty is involved, does not necessarily strike down the order. If there was an appropriate exercise of war power, the validity of the exclusion order is not impaired because it is restrictive of the citizen's liberty. The court stated in the Hirabayashi case: "Like every military control of the population of a dangerous zone in war time, it necessarily involves some infringment of individual liberty,

---

[3] The curfew restriction required that all persons of Japanese ancestry residing in a particular area be within their place of residence daily between the hours of 8:00 p. m., and 6:00 a. m.

[4] In that case an American citizen of Japanese ancestry was convicted of violating the Act of Congress of March 21, 1942, 18 U.S.C.A. § 97a, 56 Stat. 173, in that he disregarded the curfew restriction issued by the military commander of the Western Defense Command, Fourth Army. The conviction was affirmed.

* * * ". 63 S.Ct. at page 1385, 87 L.Ed. 1774. It is well settled that rights existing to the individual under the Constitution are not in their nature absolute. Chaplinsky v. State of New Hampshire, 315 U.S. 568, 574, 62 S.Ct. 766, 86 L.Ed. 1031; Whitney v. People of State of California, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (concurring opinion of Justice Brandeis re free speech and assembly); Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470.

These considerations lead to the conclusion that exclusion orders from military areas were within the war powers of Congress and the Executive acting together and, further, appropriate means for carrying out the Executive Order for the protection of military areas against sabotage and espionage, provided they were applied at the appropriate time and place.

If I am right so far, I am confronted now with the next question involved in this case—a far more difficult one and the answer to which is not found in any of the decided cases. That question is whether in April of 1943 the time and place were appropriate for the appliance of the exclusion order involved here.

This order must be judged as of the date when it was made, and the appraisal as to whether its issuance at the time and place it was made was within the boundaries of the war power must be made in the light of the conditions known to the military authorities to whom the power had been delegated to make the proper findings and determine the time and place to apply exclusion orders. In determining this question we must consider the nature of the power delegated to the military authorities. It is obvious authority was delegated to the military authorities to deprive a person of liberty and property, powers not ordinarily within the scope of governmental power and a power, because of its nature, that Congress could not constitutionally authorize exercised except in case of military necessity or emergency,[5] and the question whether such military necessity existed, is subject to judicial review.[6] Cf. Sterling v. Constantin, 287 U.S. 378, 400, 401, 53 S.Ct. 190, 77 L.Ed. 375; Mitchell v. Harmony, 13 How. 115, 134, 14 L.Ed. 75. In the Hirabayashi case which involved a restraint upon personal liberty, the court found that the military commander, in promulgating the curfew order in the light of the facts involved and in the inferences that could fairly be made, was supported in his judgment that the dangers of invasion, sabotage and espionage were imminent at the time it was applied. Hirabayashi v. United States, 63 S.Ct. at page 1386. In other words, the exercise of the power authorized was appropriate at the time it was applied under the conditions that prevailed in the Western Military Area in 1942.

In April of this year the conditions that confronted the national government in the Eastern Area were in no way comparable with those existing in the Western Area early in 1942 when the curfew order was promulgated. The critical situation there is graphically described by Chief Justice Stone in the Hirabayashi case, 63 S.Ct. at page 1383, 87 L.Ed. 1774. The Chief Justice there stated: "That reasonably prudent men charged with the responsibility of our national defense had ample ground for concluding that they must face the danger of invasion, * * * cannot be doubted". In April of this year it can hardly be said that the threat of actual invasion of the Eastern Area was real—a time when espionge and sabotage were likely to be on the increase. True, there is always some danger from sabotage and espionage in military areas where there are large war installations at all times, but this danger is a far cry from what it may be when invasion by the enemy is imminent and there is present in the area thousands technically affiliated with the invading enemy and whose continued attachment to the land of their birth against all its enemies cannot be doubted. This latter fact had great weight with the court in the Hirabayashi

---

5 Cf. "The clear and present danger" doctrine regarded as an appropriate guide in determining the constitutionality of the restriction upon the right of free speech. Bridges v. State of California, 314 U.S. 252, 262, 62 S.Ct. 190, 86 L.Ed. 192; Thornhill v. State of Alabama, 310 U.S. 88, 105, 60 S.Ct. 736, 87 L.Ed. 1093; Justice Brandeis concurring in Whitney v. People of State of California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095; and Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470.

6 Cf. Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537, where Congress had power to authorize the nature of the action taken if necessity existed and the finality of the judgment of the executive in determining the necessity.

case in the determination that the curfew order as applied and at the time it was applied was appropriate. As the Chief Justice stated (63 S.Ct. at page 1384, 87 L. Ed. 1774): "* * * social, economic and political conditions which have prevailed since the close of the last century, when the Japanese began to come to this country in substantial numbers, have intensified their solidarity and have in large measure prevented their assimilation as an integral part of the white population."

Although the Hirabayashi case is one where personal liberty was restricted, it is of little help to us in this case in reaching the proper conclusion with respect to the issue we are now discussing. Each case must be bottomed on its own facts, especially when dealing with the nature of the power exercised here by the military authorities. Appropriate action with respect to one type of restriction in a situation at a certain time and place is not at all helpful in determining the appropriateness of action at another time and place unless the conditions and degree of restraint upon personal liberty imposed are reasonably comparable. Military necessity will vary materially in different localities and at different times and the appropriate degree of restriction, not to be excessive, must bear a reasonable relation to the degree of danger. Again searching the Hirabayashi case for help in solving the problem here, we see that conditions in the Western and Eastern Areas, when the respective restrictions were imposed, were radically different. There was in the Western Area a pressing and immediate emergency justifying the application of the curfew order when it was applied. We have no such problem in the East as they had there in early April, 1942, nor even as they have now under the present conditions, and we must also keep in mind that in this case we are dealing with an order involving a far more drastic restriction of individual liberty than was present in the curfew order, a restriction upon liberty of movement in several military areas embracing a very large portion of the United States and at the same time, though probably not so important, a very serious economic damage. When Congress approved Executive Order No. 9066, the legislation was directed solely to the exclusion of citizens of Japanese ancestry from the Western Military Area. "* * * the aim of Congress and the Executive was the protection against sabotage of war materials and utilities in areas thought to be in danger of Japanese invasion and air attack". Hirabayashi v. United States, 63 S.Ct. at page 1386, 87 L.Ed. 1774.

True, Congress by the Act of 1942 passed an act broad enough to embrace all designated military areas with no distinction as to race, yet, with its knowledge of the limitations of governmental war power, it did not—nor could it constitutionally—authorize the imposition of such drastic restrictions as are here involved upon the right guaranteed our citizens under the Fifth Amendment to be free from physical restraint in moving freely from state to state (cf. Edwards v. People of State of California, 314 U.S. 160, 178, 179, 62 S.Ct. 164, 86 L.Ed. 119; 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97; Allgeyer v. State of Louisiana, 165 U.S. 578, 589, 17 S.Ct. 427, 41 L. Ed. 832), unless the exercise of the war power was reasonable and necessary at the time and place of its application. As has been stated, no such conditions prevailed in the Eastern Area in April of 1943 as existed in the Western Area early in 1942 when the much less stringent restriction of a curfew order was imposed and held validly done by the Supreme Court. True, there is a "sensitive area" here. However, upon this evidence alone a conclusion is not warranted there was a real and present danger to our military resources. The military authorities have concluded there was such in April of this year but the court is not compelled to accept their ipse dixit. Without doubt there are some "fifth columnists" in our midst. The courts were open and functioning—not a complete justification for striking down purely preventive measures, but an important circumstance in the absence of a real threat of immediate danger. There was and is ample power in the civil courts to deal in a punitive manner with sporadic cases. And—a weighty circumstance—it cannot be denied that the vast majority of the citizens in this area are law-abiding and loyal.

It does not seem realistic to say that military necessity required the application of such drastic restrictions on the liberty of United States citizens as have been imposed upon this plaintiff. Agreeing unequivocally that the authorities should be given wide latitude in the exercise of the power authorized and realizing full well I have no right to substitute my judgment for theirs as to the appropriateness of the order at the time it was imposed, yet, in the

light of the constitutional questions presented, it is finally for the court, considering the nature of the power exercised and with knowledge that the war power does not remove limitations safeguarding essential liberties (Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481), to determine the question as to whether the action taken was appropriate to the situation in April of 1943. Cf. Sterling v. Constantin, supra. Under all the circumstances, it is my conclusion it was not. I do not believe in the light of conditions prevailing in the Eastern Military Area in April of this year, the time when the exclusion order was applied, there was present a reasonable and substantial basis for the judgment the military authorities made, i.e., that the threat of espionage and sabotage to our military resources was real and imminent. Consequently, the order at the time it was applied was an excessive exercise of authority and invalid.

The view taken here makes it unnecessary to consider other aspects of the questions of substantive and procedural due process and, in view of the express terms of the Act of 1942 which provided a penalty for failure to comply with an exclusion order, whether in any event the military authorities could forcibly exclude one disobeying an exclusion order if the latter was found to be valid.

The parties will submit a decree in accordance with this opinion.