**Arthur D. JACOBS, Appellant,**

v.

**William P. BARR,\* et al., Appellees.**

**No. 91–5061.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1991.

Decided March 27, 1992.

---

\* Richard Thornburgh was Attorney General of the United States when Mr. Jacobs filed his complaint on March 9, 1989. William P. Barr is now Attorney General, and he has been substituted for Mr. Thornburgh under Fed. R.App.P. 43(c).

**314**

Greta Van Susteren, with whom John P. Coale, Washington, D.C., was on the brief, for appellant.

Irving Gornstein, Atty., Dept. of Justice, Washington, D.C., for appellees.

Willard K. Tom, Washington, D.C., was on the brief, for amici curiae, urging that this Court affirm the District Court's decision to dismiss Mr. Jacobs's complaint.

Before: MIKVA, Chief Judge, EDWARDS and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Fifty years ago, President Roosevelt authorized his Secretary of War to send Japanese Americans to internment camps solely because of their race. Four years ago, Congress passed a Civil Liberties Act to compensate the victims of the policy, and to apologize for the "grave injustice" they had suffered. 50 App. U.S.C. § 1989a(a). Today, Arthur Jacobs, an American citizen who says he was detained with his German father in 1945, argues unexpectedly that the Civil Liberties Act is unconstitutional. Because the Act compensates interns of Japanese and Aleutian, but not German, descent, he says it denies him the equal protection of the laws.

We disagree with the district court's conclusion that Mr. Jacobs has no standing to bring his suit. He alleges that he was denied compensation under the Act even though he, like the children of Japanese Americans, was interned by the United States government, and that is enough to establish injury under Article III. But we reject Mr. Jacobs's claim on the merits. After three years of testimony from hun-

dreds of witnesses, Congress concluded that Japanese Americans were detained *en masse* because of racial prejudice and demagoguery, while German Americans were detained in small numbers, and only after individual hearings about their loyalty. Congress's conclusions, which are amply supported by the historical record, suggest that the decision to compensate Japanese but not German Americans can survive the most exacting equal protection review—let alone the intermediate scrutiny that the Supreme Court requires us to apply.

### I. BACKGROUND

Arthur Jacobs was born in Brooklyn in 1933 and was interned, along with his German father, at Ellis Island in February, 1945. His complaint alleges that was interned "as a consequence of the internment of his father," ¶ 15, but he provides no details about why, precisely, either he or his father was interned. (At oral argument, his counsel conceded that the father was interned after an individual hearing, rather than as part of a mass deportation program of the kind directed against the Japanese. She could not say, however, whether Mr. Jacobs was ordered by the government to accompany his father, or whether he went because his father chose to keep the family together. Transcript of Oral Argument at 12.) In April, 1945, the family was transferred to an internment camp at Crystal City, Texas, where they remained until the beginning of December. At Crystal City, Mr. Jacobs says that he was treated no differently than the children of Japanese interns, who taught him, he alleges, how to "eat sushi" and to make "sandals and kites." *Affidavit of Arthur D. Jacobs* at 2.

On August 10, 1988, Congress passed the Civil Liberties Act of 1988, Title I of "An Act to Implement the Recommendations of the Commission on Wartime Relocation and Internment of Civilians." Pub.L. No. 383; 50 App. U.S.C. § 1989–1989d. Recognizing that "a grave injustice was done both to citizens and permanent resident aliens of Japanese ancestry by their forced reloca-

tion and internment during World War II," Congress attempted to make amends by issuing a formal apology and $20,000 to each Japanese intern. 50 App. U.S.C. §§ 1989a, 1989b–4. In the same legislation, Congress passed the Aleutian and Pribilof Islands Restitution Act, which authorizes an apology and an award of $12,000 to each eligible Aleut. 50 App. U.S.C. §§ 1989c, 1989c–5. Congress found that the Aleuts were relocated to Alaska "long after any potential danger to their home villages had passed" and that the "United States failed to provide reasonable care" for them and for their property. 50 App. U.S.C. § 1989a(b).

Congress passed the Civil Liberties Act after collecting volumes of evidence about the injustices suffered by Japanese Americans. It had previously authorized three years of investigation by a Commission on Wartime Relocation and Internment of Civilians. The Commission's conclusions, presented to Congress in a December 1982 report called *Personal Justice Denied*, relied on hundreds of thousands of documents and testimony from over 750 witnesses. *Id.* at vii, 1. The Commission found unambiguously that Executive Order No. 9066 and the military orders affecting Japanese Americans were the products of prejudice and demagoguery, rather than military necessity. *Personal Justice Denied* at 4–6, 27–46. But it also found that "no mass exclusion or detention, in any part of the country was ordered against American citizens of German or Italian descent," and that actions against German or Italian aliens were "much more individualized and selective than those imposed on the ethnic Japanese." *Id.* at 3.

In enacting the Civil Liberties Act, Congress noted that the premises relied on in Supreme Court decisions upholding the internment have been repudiated by scholars, by former government officials, and more recently, by courts. *See, e.g.,* H.R.Rep. No. 278, 100th Cong., 1st Sess. 9 (1987). In 1983, Fred Korematsu, Gordon Hirabayashi, and Minoru Yasui, who had challenged the constitutionality of the internment, reopened their landmark federal cases through writs of error *coram nobis.* Their wartime convictions for defying the internment policy were vacated, based on evidence that the government had misrepresented and suppressed evidence that racial prejudice, not military necessity, motivated the internment of Japanese Americans. *Korematsu v. United States,* 584 F.Supp. 1406 (N.D.Cal.1984); *Hirabayashi v. United States,* 627 F.Supp. 1445 (W.D.Wash. 1986), *aff'd in part and rev'd in part,* 828 F.2d 591 (9th Cir.1987); *Yasui v. United States,* 83–151 BE (D.Or.1984), *remanded,* 772 F.2d 1496 (9th Cir.1985). None of the decisions was reversed on appeal. For an admirable review of the history of the internment policy, see *Hohri v. United States,* 782 F.2d 227, 231–39 (D.C.Cir.1986) (Wright, J.), *vacated,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987).

Mr. Jacobs filed this purported class action for injunctive and declaratory relief on March 9, 1989. Complaint ¶¶ 1, 7. Because only interns of Japanese and Aleutian ancestry are entitled to redress under the Civil Liberties Act, he alleges that it discriminates on the basis of national origin in violation of the Fifth Amendment. *Id.* ¶¶ 1, 8, 17–19. On January 22, 1991, the district court held that he had failed to allege facts establishing his standing to challenge the Civil Liberties Act and dismissed the action. Mem. Op. at 15 (Jan. 22, 1991).

This appeal followed.

## II. ANALYSIS

### A. *Standing*

■ The constitutional requirement for standing has three prongs. First, plaintiffs must allege that they have suffered some actual or threatened injury; second, the injury must be fairly traceable to the challenged official conduct and, third, there must be a substantial likelihood that the alleged injuries will be redressed by a judicial decision in the plaintiffs' favor. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

■ The broad injury that Mr. Jacobs alleges is that the Civil Liberties Act of

1988 denies him the equal protection of the laws. Complaint, ¶ 17. When the injury alleged is the denial of equal protection, plaintiffs must also allege that they are being denied equal treatment solely as a result of the classification they are challenging. *Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394–95, 79 L.Ed.2d 646 (1984).

The district court dismissed the complaint because it concluded that Mr. Jacobs had failed to allege any injury at all:

> The fact that he was interned is simply not enough to establish standing. As the government notes, the plaintiff does not allege that there is any similarity between his internment and that of those persons referred to in the above Acts.... [A]ll the plaintiff argues is that he was interned as the result of his father's internment. His father may well have been interned for valid reasons....

Mem. Op. at 13–14; *id.* at 11 ("This Court cannot discern the basis upon which the plaintiff contends that he has been injured by the 1988 Act.").

■ We conclude that the district court has confused standing questions with defenses on the merits. Mr. Jacobs *does* allege that there is a similarity between his internment and that of the Japanese and Aleuts. In his complaint, he alleges: "Although Plaintiff experienced the precise harms and losses that the individuals of Aleutian or Japanese ancestry experienced, Plaintiff is not receiving compensation for his harm and losses." Complaint, ¶ 16. And in his response to defendant's motion to dismiss, he alleges: "Plaintiff suffered the same injury *as a result of the same governmental conduct* yet is denied the relief to which he is equitably entitled due to impermissible discrimination or exclusion and for no other reason." *Plaintiff's Response to Defendant's Motion to Dismiss*, filed 7/5/89, at 15–16 (emphasis added).

Mr. Jacobs's complaint is imprecise, but it is sufficient to satisfy the *Heckler* test which merely requires him to allege that he suffered the same injuries as the Japanese and Aleuts, and that he has been denied compensation because of his national ori-gin. The fact that Mr. Jacobs says he was interned, in other words, *is* enough to establish injury for standing purposes; he is not required to allege at the outset that he was interned *for the same reasons* as the Japanese and Aleuts, as the district court suggested. Evidence that the reasons were, in fact, radically different—that the Japanese children, for example, were interned because of virulent racial prejudice while Mr. Jacobs was interned after his father received an individualized hearing—is a defense on the merits, not a bar to standing.

■ The district court also erred when it concluded that "without further facts, the Court must assume that the actions of the government were valid." Mem. Op. at 14. The Supreme Court has repeatedly stated that when "ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969)); *see also National Wildlife Federation v. Burford*, 835 F.2d 305, 312 (1987) (D.C.Cir. 1987).

The government urges us to impose an even higher standing barrier than the district court. To establish standing, it argues on appeal, Jacobs "must show that he satisfies all the statutory criteria for receiving compensation other than being a person of Japanese ancestry." Appellees' Brief at 18. In the government's view, the only people who have standing to challenge the Civil Liberties Act are those who, but for their race, would themselves have been victims of Executive Order No. 9066. Like the district court, the government confuses standing with merits questions. We reject its ingenious theory, which would have the effect of barring most equal protection challenges even before they have been presented. *Cf. McCarthy v. Madigan*, —— U.S. ——, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (cautioning against implication of ex-

haustion requirement not ordered by Congress or based on sound exercise of judicial discretion).

Since we think Mr. Jacobs has adequately alleged injury, we turn to the remaining tests for standing, which he passes easily. The alleged injury (denial of the compensation that equal protection demands) is traceable to the asserted unconstitutional classification in the Civil Liberties Act. As for redressibility, the Supreme Court has noted that a court sustaining an equal protection challenge faces two remedial alternatives:

> [it] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion. For that reason, we have frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class.

*Heckler v. Mathews,* 465 U.S. at 738–39, 104 S.Ct. at 1394–95.

In this case, a court could order the benefits of the Civil Liberties Act to be extended to Mr. Jacobs, or it could declare the statute a nullity. Congress would then either rewrite the Act to include German Americans in Mr. Jacobs's class, or it would discard the legislation. In either case, the equal protection violation would be redressed. *See generally Califano v. Westcott,* 443 U.S. 76, 89–91, 99 S.Ct. 2655, 2663–64, 61 L.Ed.2d 382 (1979) (distinguishing invalidation from extension).

### B. *Further Discovery*

Although the district court did not reach the merits of the case, the government argues that they are ripe for decision, and a remand would not serve any useful purpose. Mr. Jacobs addressed the merits in his pleadings, and the government briefed them below and on appeal. At oral argument, Mr. Jacobs's counsel argued strenuously for further discovery, but was unable

to show how it could strengthen her client's case. Her only suggestion was that examination of the War Department's files might uncover secret evidence that General DeWitt or Secretary of War Stimson said: "We don't like the Germans; let's gather them up and let's lock them up like we are doing the Japanese." Transcript of Oral Argument at 44. She does not appear to have read the report of the Congressional Commission, which notes that General DeWitt *did* press for a program that would have allowed the removal of several thousand Germans and Italians from the West Coast. *Personal Justice Denied* at 286. But because of widespread political opposition to mass detention of Germans and Italians, Secretary Stimson persuaded President Roosevelt to reject the proposal. *Id.* at 287. Given the overwhelming evidence supporting Congress's conclusion that there was no mass detention of Germans, and given our deference to Congress's fact finding, we do not agree that further discovery on a scrupulously reported historical question would cast any useful light on the case.

In his pleadings below, Mr. Jacobs did make the remarkable (and entirely inconsistent) argument that further discovery would help him to prove that "there was a military justification for the large-scale exclusion of individuals of Japanese descent," because many Japanese were trying to organize "massive fifth-column activities." *Plaintiff's Response* at 3–4. Access to government archives, Mr. Jacobs believed, would help him "demonstrate that there was a good faith basis for the government to promulgate the exclusion orders, that the wartime exclusion and relocation was undertaken in a reasonable manner, [and] that the Plaintiff is, in fact, similarly situated to the persons being compensated under the Acts...." *Affidavit of Philip B. Allen* at 2.

It is not clear why Mr. Jacobs toyed with the idea of *defending* the internment policy, except to argue in the alternative that even if his father *had been* legitimately detained because his loyalty was suspect, many Japanese were disloyal as well. (The

bizarre theory seemed to be that Congress deprived disloyal German interns of equal protection when it compensated disloyal Japanese interns. *Plaintiff's Response* at 23.) Mr. Jacobs's appellate counsel, fortunately, suggested at oral argument that her client was no longer seeking discovery on the question of Japanese American treachery, and would concentrate instead on uncovering evidence of prejudice against German Americans. Since Congress has examined that evidence exhaustively, we conclude that the questions that remain in dispute are constitutional not factual, and we have all the information we need to decide them. We turn, therefore, to the merits.

## C. *The Merits*

### 1. *Standard of Review*

There is an initial dispute about our standard of review. In *Metro Broadcasting Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), the Supreme Court held that "benign race-conscious measures mandated by Congress—even if those measures are not "remedial in the sense of being designed to compensate victims of past governmental or societal discrimination'—are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to the achievement of those objectives." *Id.* 110 S.Ct. at 3008–09 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519, 100 S.Ct. 2758, 2796, 65 L.Ed.2d 902 (1980)).

It would seem hard to claim that the Civil Liberties Act of 1988—which *was* designed to compensate victims of past governmental discrimination—should be subject to even stricter scrutiny than the nonremedial measures upheld in *Metro Broadcasting*. Mr. Jacobs, however, insists that the Civil Liberties Act should be subject to strict scrutiny, and should be upheld only if it is narrowly tailored to meet a compelling governmental interest. *Plaintiff's Response* at 22; *see also* Reply Brief for Appellant at 4 (incorporating merits arguments from pleadings below). *Metro*

*Broadcasting* compels us to reject his argument.

There are not yet any cases applying strict scrutiny to remedial racial classifications approved by Congress; on the contrary, strict scrutiny has only been applied to race-conscious remedies designed by municipalities, or lower courts. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 490, 109 S.Ct. 706, 719, 102 L.Ed.2d 854 (1989) ("That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate."); *see also United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (district court's race conscious remedial order subjected to strict scrutiny). The *Paradise* Court, however, noted:

> Although this Court has consistently held that some elevated level of scrutiny is required when a racial or ethnic distinction is made for remedial purposes, it has yet to reach consensus on the appropriate constitutional analysis. We need not do so in this case however, because we conclude that the relief ordered survives even strict scrutiny analysis.

*Id.* at 166–167, 107 S.Ct. at 1064.

Like the *Paradise* Court, we have no doubt that the Civil Liberties Act of 1988 *could* survive the strictest scrutiny, and like the *Paradise* Court, we will apply the more exacting test for demonstrative purposes only.

The *Metro* Court made another distinction that controls our decision in this case:

> Although we do not " 'defer' " to the judgment of the Congress and the Commission *on a constitutional question....* we must pay close attention to the expertise of the Commission and the factfinding of Congress *when analyzing the nexus* between minority ownership and programming diversity. With respect to this "complex" *empirical question*, we are required to give *"great weight"* to the decisions of Congress and the experience of the Commission."

*Id.* 110 S.Ct. at 3011 (emphases added) (citations omitted).

■ The holding of *Metro,* in other words, is that although courts should not defer to Congress on constitutional questions, we *should* defer—or give "great weight"—to Congress on empirical questions. We see no difference between "great weight" and "deference," which the Supreme Court and this Court have consistently treated as synonyms. *See, e.g., Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); *Commonwealth Edison Co. v. United States Dept. of Energy,* 877 F.2d 1042, 1045 (D.C.Cir.1989).

In light of *Metro* and its predecessors, we must give "great weight" to Congress's factual findings that the Japanese internment program was "motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership," 50 App. U.S.C. § 1989a, while the internment of Germans and Italians was not.

### 2. *Congress's Conclusions*

■ In enacting the Civil Liberties Act, Congress sought to remedy "a grave injustice" and "fundamental violations" of "basic civil liberties and constitutional rights." 50 App. U.S.C. § 1989a. In particular, Congress found that the Japanese internment policies "were carried out without adequate security reasons" and "were motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership." *Id.* "The Government unquestionably has a compelling interest in remedying past ... discrimination by a state actor," *United States v. Paradise,* 480 U.S. at 167, 107 S.Ct. at 1064, especially discrimination as ugly as the policies endorsed by the government in *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Unless Mr. Jacobs can show that he, like the children of Japanese descent, was interned because of racial prejudice, then it seems obvious that the remedy Congress chose in the Civil Liberties Act (compensating children of Japanese but not German descent) is substantially related to the ends of the Act (compensating those who were interned because of racial prejudice). The remedy, in fact, would represent a "perfect fit between means and ends." *Croson,* 488 U.S. at 526–27, 109 S.Ct. at 738–39 (Scalia, J., concurring in the judgment).

But Mr. Jacobs cannot show—he does not even allege—that he was interned because of racial prejudice. The children of Japanese descent were not interned simply because their parents were interned, but because they themselves were subject to the Civil Exclusion Orders issued pursuant to Executive Order No. 9066. *See, e.g., Ex Parte Mitsuye Endo,* 323 U.S. 283, 288, 65 S.Ct. 208, 212, 89 L.Ed. 243 (1944) (emphasis added) (Civilian Exclusion Order No. 52 excludes *"all persons* of Japanese ancestry, both alien and non-alien" from Sacramento, California). Mr. Jacobs, by contrast, alleges that he was interned not as a consequence of racial prejudice, but "as a consequence of the internment of his father." Complaint, ¶ 15. He provides no other details about why, precisely, his father was interned; but his counsel conceded at oral argument that the father was interned as a result of an individual hearing, rather than a mass deportation policy of the kind directed against the Japanese. Transcript of Oral Argument at 15. She did not know whether Mr. Jacobs was ordered by the government to accompany his father, or whether he went because his father chose to keep the family together. *Id.* at 12. But even if we assume that Mr. Jacobs was ordered to accompany his father, he cannot prevail unless he can prove the following, improbable proposition: that although his father was interned after a valid hearing, he, Jacobs, was ordered to accompany his father because of "racial prejudice, wartime hysteria, and a failure of political leadership." 50 App. U.S.C. § 1989a.

After extensive testimony, however, Congress found that *"no* mass exclusion or detention, in any part of the country, was ordered against American citizens of German or Italian descent. Official actions against enemy aliens of other nationalities were much more individualized and selective than those imposed on the ethnic Japa-

nese." *Personal Justice Denied* at 3 (emphasis added). Congress does not appear to have distinguished in its findings between the treatment of the children of German interns and the treatment of the interns themselves. We do not know, therefore, whether children like Mr. Jacobs were ordered to accompany their fathers as a matter of course; if so, whether they received hearings; or if not, whether it was simply assumed that families would stay together. But this much is clear: Congress's finding that "no mass exclusion or detention … was ordered against American citizens of German or Italian descent" is broad enough to cover children as well as adults, and it leaves no room for the unlikely suggestion that German American children were the victims of prejudice, while their fathers were not.

If evidence before Congress *had* suggested that German children experienced the same racial prejudice as Japanese children, Mr. Jacobs could certainly argue that Congress was wrong to extend benefits arbitrarily to the Japanese alone. *Cf. Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966). Of course Congress cannot exclude an identifiable group from a remedial program because of racial or ethnic prejudice. *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 359–360 n. 35, 98 S.Ct. 2733, 2783 n. 35, 57 L.Ed.2d 750 (1978) (opinion of Brennan, White, Marshall, and Blackmun, JJ.). But Congress has concluded that Germans were *not* subject to the same prejudice as Japanese, and we must give its empirical conclusion "great weight." *Metro Broadcasting,* 110 S.Ct. at 3008.

Congress's findings, in any case, would survive any standard of review, since the historical evidence is hardly controversial. (The evidence is discussed in detail in chapter 12 of the Commission's report, "Germans and German Americans," *id.* at 283–293.) The report concludes that in the spring of 1942, the War Department debated whether the power of Executive Order No. 9066 should be used to exclude categories of German and Italian aliens. There were no serious proposals for the mass deportation of all Germans and Italians, but General DeWitt pressed for the removal of several thousand aliens from the West Coast. President Roosevelt rejected the proposal because of widespread political opposition to the detention of Germans and Italians. When the evacuation of the Japanese was about to begin, a congressional select committee called the mass movement of Germans and Italians "out of the question if we intend to win this war." *Report of the Select Committee Investigating National Defense Migration,* U.S. House of Representatives, 77th Cong., 2d Sess., H.R. Report No. 1911, p. 24. Accordingly, General DeWitt on the West Coast, and General Drum on the East Coast, issued individual exclusion orders to a small number of Germans and Italians. *Personal Justice Denied* at 288. The report concludes that visceral prejudice toward Asians, combined with the political influence of Germans accounted for the very different treatment of Japanese and German Americans. *Id.* at 289.

The report also points to cases reversing individual German American exclusion orders as further evidence of the lack of widespread prejudice toward Germans. *Id.* at 115–16, (discussing *Schueller v. Drum,* 51 F.Supp. 383 (E.D.Pa.1943) and *Ebel v. Drum,* 52 F.Supp. 189 (D.Mass.1943)). These cases are different from the Japanese cases in three respects. First, the exclusion of German Americans, unlike the mass exclusion of Japanese Americans, involved individual administrative and judicial proceedings which focussed on the military threat posed in each case. *Personal Justice Denied* at 115–16. Second, courts in the German American cases took a skeptical, rather than deferential, view of the military's sweeping claims about the threat posed by the excluded person. *Id.* Comparing Mr. Ebel's case with Mr. Hirabayashi's, for example, the *Ebel* court concluded: "There is no such question of discrimination involved in this case. The plaintiff Ebel was not ordered excluded because he was a German or because he was a naturalized citizen, but only on the ground he was dangerous to the national defense." *Ebel v. Drum,* 52 F.Supp. at 194.

Finally, many of the German exclusions were reversed, even though the evidence against the individuals in question was much more compelling than the vague accusations directed at the Japanese. Mr. Ebel, for example, kept up intimate contacts with the German consul, and was an enthusiastic fundraiser for the Kyffhaeuser Bund. *Id.* at 192. The court described Mr. Scherzberg as someone "more imbued with Nazi principles than with American ideals," *Scherzberg v. Maderia*, 57 F.Supp. 42, 47 (E.D.Pa.1944), especially since he called the British catastrophe at Dunkirk "a good thing," and had installed a short wave radio in his car to beam Nazi propaganda throughout greater Philadelphia. *Id.* at 43–44. Both men, nevertheless, were freed, while Japanese Americans, whose loyalty was never questioned, were imprisoned.

In debates over the Civil Liberties Act of 1988, individual members of Congress also emphasized the very different treatment of Japanese and German Americans. Representative Frank, for example, said: "I don't see how anybody can look at these historical events and deny that racial prejudice is there, when Japanese Americans were treated so differently than German Americans, Italian Americans, or Americans who had an ethnic ancestry affiliated with any other country." *Legislation to Implement the Recommendations to the Commission on Wartime Relocation and Internment of Civilians: Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. of the Judiciary*, 100th Cong., 1st Sess. 157 (April 29, 1987). Representative Lowry, similarly, explained that he had grown up in a part of Washington in which almost everyone was German, and none of them was interned during the War. *Civil Liberties Act of 1985 and Aleutian and Pribilof Islands Restitution Act Part 1: Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. on the Judiciary*, 99th Cong., 2d Sess. 61 (April 28 and July 23, 1986). Representative Panetta, a co-sponsor of the House bill, found it "bitterly ironic—and an unattractive reflection of fear and prejudice—that Americans of German or Italian ancestry were not considered a similar threat even though we were also at war with those countries." *Id.*, 99th Cong., 2d Sess. 1520 (April 28 and July 23, 1986). And Representative Mineta, who had himself been interned, said: "We did not lock up German–Americans. We did not lock up Italian–Americans.... Why is it that we just happened to lock up an ethnic group subject to decades of blatant and cruel discrimination? Because this was the group that popular opinion ... demanded to have locked up." *Japanese American and Aleutian Wartime Relocation: Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the House Comm. on the Judiciary*, 98th Cong., 2d Sess. 75 (June 20, 21, 27, and Sept. 12, 1984).

All this is to say that Congress considered extensive evidence that Japanese Americans were the victims of widespread racial prejudice, while German Americans were not; and we would confidently uphold Congress's factual conclusions even if we were not compelled, as we are, to give them "great weight." We conclude, therefore, that Congress's decision to compensate Japanese but not German Americans is substantially related (as well as narrowly tailored) to the important (and compelling) governmental interest of compensating those who were interned during World War II because of racial prejudice.

The district court, finally, did not address Mr. Jacobs's claim that he is similarly situated to the Aleuts. And since Mr. Jacobs does not even allege that the United States failed to provide him with reasonable care, or that he was relocated from Brooklyn "long after any danger to his home village had passed," *cf.* 50 App. U.S.C. § 1989a(b), we will not address it either.

### III. CONCLUSION

We vacate the district court's holding that Mr. Jacobs has no standing to bring his suit, but we reject Mr. Jacobs's claim on the merits. Congress's finding that Japanese Americans were the victims of prejudice, while German Americans were not, is broad enough to cover children as well as

adults; and it is amply supported by historical evidence that the internment policy extended to Japanese American but not to German American children. Congress, therefore, had clear and sufficient reason to compensate interns of Japanese but not German descent; and the compensation is substantially related (as well as narrowly tailored) to Congress's compelling interest in redressing a shameful example of national discrimination.

We conclude, in short, that the Civil Liberties Act of 1988 does not deprive Mr. Jacobs of the equal protection of the laws, and we remand to the district court with instructions to enter judgment on the merits in favor of the defendants.

*It is so ordered.*